RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RALPH CARUSONE,

                    *Petitioner-Appellant*,

v.

WARDEN, NORTH CENTRAL CORRECTIONAL INSTITUTION,

                    *Respondent-Appellee*.

No. 18-4175

> Appeal from the United States District Court
> for the Southern District of Ohio at Cincinnati.
> No. 1:16-cv-00742—Timothy S. Black, District Judge.

Argued: April 16, 2020

Decided and Filed: July 17, 2020

Before: MOORE, KETHLEDGE, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** William R. Gallagher, ARENSTEIN & GALLACHER, Cincinnati, Ohio, for Appellant. Daniel J. Benoit, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** William R. Gallagher, ARENSTEIN & GALLACHER, Cincinnati, Ohio, for Appellant. Daniel J. Benoit, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

KETHLEDGE, Circuit Judge. The State of Ohio convicted Ralph Carusone of felony murder exclusively on the theory—as the prosecution repeatedly emphasized in its closing

argument at trial—that Carusone "plunged [a] knife into the victim's heart." But that theory, as the state court of appeals later found, was "plainly discredit[ed]" by medical records that the State admits it wrongfully suppressed before trial. And the state court of appeals itself plainly misapplied the governing Supreme Court precedent when it denied relief on Carusone's due process claim. We therefore hold that Carusone is entitled to a writ of habeas corpus, and reverse the district court's decision to the contrary.

I.

A.

In July 2006, Derek Rininger stole $500 from the apartment of his former girlfriend, Jennifer Kron. A few days later, during a series of phone calls, Rininger argued about the money with Kron and Carusone, who apparently was Kron's boyfriend at the time. Eventually Rininger told Kron to drive to his house to recover the money, which Kron did with Carusone in the passenger seat. Kron pulled up across the street from the house after midnight. Rininger ran out the door, down a hill, and straight to the passenger side of Kron's car, where he took a swing a Carusone. The two men then fought outside the car; both were bloody when Carusone retreated back to the passenger seat. Rininger ran around to Kron's door and reached through the open window for the car keys. The two men scuffled again, with Kron between them, until Kron put the car in gear and drove off.

Rininger then ran up the hill and into his house. Soon he emerged from the back door, circled back to the front porch, and jumped off the side of the steps. Then he called 911, reporting through labored breaths that he had been stabbed. Emergency medical personnel arrived 20 minutes later, finding Rininger barely conscious with a blood-soaked towel between his left arm and abdomen. Pulsating blood came from Rininger's inner left bicep; he also had a knife wound near the bottom of his left ribcage. Within minutes Rininger went into full cardiac arrest, his pupils fixed and dilated.

Emergency personnel tried and failed to resuscitate Rininger on the way to the hospital. Once there, an ER doctor continued those efforts, in part by piercing Rininger's chest with two needles: one to release any air pressure in his abdomen (a "needle thoracostomy") and another to

drain any blood from around his heart (a "pericardiocentesis"). Neither procedure was successful, and after 30 minutes Rininger was pronounced dead. A bloody pocketknife was found in his shorts.

The county deputy coroner, Dr. Michael Kenny, performed an autopsy on Rininger a few hours later—before the ER doctor wrote up a report describing (among other things) the thoracostomy and pericardiocentesis procedures. Dr. Kenny concluded that Rininger had died from a stab wound on his left ribcage, which penetrated far enough to cause a "hole into the right side of his heart[.]" Dr. Kenny also found that, at the time of death, Rininger had significant levels of cocaine and alcohol in his blood, along with a tranquilizer, marijuana, and hydrocodone.

Carusone was charged in state court with "purposeful murder" and felony murder for Rininger's death. During discovery, the State produced three pages of hospital records regarding Rininger's treatment, but failed to produce another five pages of those records, which included the ER doctor's typed report and an x-ray of Rininger's chest. At trial—based on Dr. Kenny's testimony that Rininger had died from a stab wound to the heart—the prosecution repeatedly told the jury that Carusone had "purposely and knowingly plunged that knife into the victim's heart." The jury acquitted Carusone of purposeful murder but convicted him of felony murder, and the trial court sentenced him to 15 years to life in prison. The state court of appeals affirmed; the Ohio Supreme Court denied review.

B.

In 2010, largely as a result of an investigation begun by Carusone's mother, Carusone discovered that the State had withheld five pages of the hospital's records (including the ER doctor's report and a chest x-ray) and a portion of the fire department's report of its run to pick up Rininger. Carusone's mother then retained Dr. Thomas Young, a forensic pathologist who had conducted more than 5,400 autopsies. Based in part on the undisclosed hospital records, Dr. Young opined in an affidavit that Rininger had "died as a result of cardiac arrest brought about by the combined effects of multiple drugs and alcohol and by heavy stress and exertion following a physical confrontation." Dr. Young further opined that the "hole" in the right side of

Rininger's heart was "consistent with the needle pericardiocentesis procedure but not a stab wound from the left side of the chest"; that "[i]t is inconceivable how a stab wound from the left side could penetrate the heart in the posterior right side without perforating or penetrating the left ventricle or the diaphragm"; and that "what the autopsy pathologist claims as a stab wound is in reality an injury from pericardiocentesis."

Carusone then filed a motion for a new trial, which the trial court denied. But the court of appeals reversed for an evidentiary hearing, holding that Carusone had "demonstrated that the undisclosed evidence was material in the sense that it might reasonably be said to undermine confidence in the jury's verdict[.]"

During the evidentiary hearing on remand, Dr. Young testified that Dr. Kenny's autopsy report "does not make any account of anything in between" the knife wound to the left ribcage and the hole in the right ventricle; that "[i]n order for the knife blade to basically reach that particular area in the right ventricle it would have to go through the diaphragm and go through the left ventricle"; that "[n]o such defects are recorded or documented"; and hence that Dr. Kenny's conclusion that Rininger died from a stab wound to the chest "doesn't make any sense anatomically."

Nor, in Dr. Young's opinion, did Dr. Kenny's opinion make sense functionally. Dr. Young testified that "I don't think that [Rininger] would have made it up to the house if he had a stab wound to the heart. He had to basically go up a hill and run around the house and pull out the cell phone and make the 911 call. . . . [T]he blood loss from a heart defect like that would be so rapid that in a matter of even a minute, a couple of minutes, he would be unconscious[.]"

Nor, in Dr. Young's opinion, was Dr. Kenny's opinion consistent with the hospital records. The ER doctor's report tended to confirm the "needle pericardiocentesis" likely caused the hole in Rininger's heart, given that the needle was necessarily inserted hastily and very close to the heart. In addition, as the ER doctor noted in his report, the chest x-ray revealed no "abdominal free air"—a finding confirmed by the doctor's observation that the "[a]bdomen appeared soft; it did not appear distended at all"—which was likewise contrary to the theory that a knife had penetrated the abdomen. The treating doctor's report also made clear that the ER

staff "were not dealing with anything that was involving a major vascular structure and blood loss. They were dealing with the cardiac arrest. The heart had stopped, and they were trying to get the heart going again."

Dr. Young also testified as to his opinion that "[t]he cause of death is the combined effects of multiple drugs and alcohol, and heavy stress and exertion. The two put together caused the heart to stop." Dr. Young explained:

> [W]ith a lot of stress you release a lot of hormone called Epinephrin or Adrenaline. And that basically drives the heart into a frenzy. And at the same time he has got cocaine in his system; he has got alcohol in his system. You put cocaine and alcohol together and you get something that is even worse than the two combined. . . . And plus, he has also got some marijuana too, and some other drugs. So all of that together is going to have an effect on heart function.

On cross-examination, Dr. Young conceded that "you could look at [the stab wounds] as being part of the stress that he is undergoing. . . . But in a situation there for the stab wounds to actually lead to significant bleeding that is going to put him into shock, he would have to lose several liters of blood. . . . And from the records that I recall seeing, I didn't see any sense that there was that."

The trial court again denied Carusone's motion for a new trial. The court of appeals affirmed. The court did find that the "evidence offered in support of Carusone's motion for a new trial plainly discredits the deputy coroner's opinion testimony that the cause of Rininger's death was a stab wound to the heart." The court also appeared to adopt Dr. Young's opinion that "'heavy stress and exertion' along with 'the combined effects of multiple drugs and alcohol had together caused Rininger's heart to stop.'" (Ellipses and brackets omitted.) But the court noted that Dr. Young had testified that the stab wounds "'add[ed] to the stress of the situation[.]'" On that basis, the court concluded that Carusone's new evidence, when "considered collectively and with the evidence adduced at trial, would support a finding, beyond a reasonable doubt, that Carusone had caused Rininger's death as the proximate result" of the stab wounds. The court thus held that the trial court "properly denied Carusone a new trial."

The Ohio Supreme Court again denied review. Carusone thereafter filed the habeas petition at issue here, which the district court denied. This appeal followed.

II.

The question in this appeal is whether the state court of appeals unreasonably applied clearly established Supreme Court precedent when it affirmed the trial court's denial of Carusone's motion for a new trial. 28 U.S.C. § 2254(d). An unreasonable application of Supreme Court precedent, for purposes of the federal habeas statute, is one with which no fairminded jurist would agree. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The relevant Supreme Court precedents here are *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995). In *Brady*, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Kyles*, the Court reiterated that evidence is "material" when there exists "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 514 U.S. at 435 (internal quotation marks omitted). And in *Kyles* the Court specified that the "reasonable probability" standard is met by a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*.

The question is whether Carusone has made that showing here. As an initial matter, some of the evidence on which Carusone relies—notably, the recantation of Jacob Carroll, a prosecution witness at trial—did not exist at the time of trial, and thus was not "suppressed" within the meaning of *Brady*. *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005). The relevant evidence here, rather, is the five pages of hospital records not disclosed by the prosecution before trial. The State concedes that it should have produced those records; thus, the remaining question is whether the state court of appeals unreasonably applied *Kyles* when it held that the undisclosed evidence does not undermine confidence in the verdict.

On that question there is still more common ground. Everyone agrees—as the state court of appeals itself found—that the relevant evidence here "plainly discredits the deputy coroner's opinion testimony that the cause of Rininger's death was a stab wound to the heart." And that theory—that Rininger died from a stab wound to the heart—was exclusively the theory that the

prosecution offered to the jury at trial. The relevant evidence thus undisputedly discredits the actual theory on which, by all appearances, the jury based its verdict.

The state court held that its confidence in the verdict was unshaken nonetheless, based on an alternative theory of conviction. That theory was based largely on Dr. Young's opinion as to the cause of Rininger's death: that the adrenaline and exertion resulting from the fight, combined with the cocaine, alcohol and other drugs in Rininger's system, sent his heart into a "frenzy" and ultimately caused it to stop. Even that theory would support a conviction for felony murder, the state court held, because Dr. Young conceded that the stab wounds could have "'add[ed] to the stress of the situation.'"

But there are two problems with that reasoning. The first is that the court's alternative theory was unsupported by any expert opinion in the case. Dr. Young's testimony as a whole shows that he regarded the stab wounds' contribution to Rininger's death as incidental—that, at most, their importance was "very, very ambiguous." And Dr. Kenny, for his part, rejected the idea that Rininger died from anything other than a knife blade penetrating his heart. The reasoning of the court of appeals thus amounts to speculation that a jury would go further than any expert did, and find that "stress" from the stab wounds was a proximate cause of Rininger's death.

The second problem with the state court's reasoning is that it effectively replaced the *Kyles* standard with one more favorable to the prosecution. Specifically, the court held that the evidence in the record, considered as a whole, "would support a finding, beyond a reasonable doubt," that Rininger's death was the "proximate result" of stress from the stab wounds. That amounts to merely a conclusion that the evidence was sufficient to support a conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And in *Kyles* the Court specifically said that the test for materiality under *Brady* "is not a sufficiency of evidence test." 514 U.S. at 434; *see also id*. ("a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal").

What *Kyles* requires the defendant to show, rather, is only that the suppressed evidence "undermine[s] confidence in the verdict." *Id*. at 435. Here, as the court of appeals itself found,

the suppressed evidence "plainly discredited" the actual theory upon which the prosecution obtained a conviction. And the court of appeals sought to bridge the gap between its alternative theory of conviction, on the one side, and the medical opinion testimony to the contrary, on the other, by applying precisely the standard that the Supreme Court in *Kyles* said not to apply. What remains is a discredited verdict. Even under the demanding standard of the federal habeas statute, therefore, the state court's rejection of Carusone's *Brady* claim was an unreasonable application of clearly established Supreme Court precedent.

\* \* \*

The district court's judgment is reversed, and the case is remanded with instructions to grant a writ of habeas corpus.