**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0512n.06

**No. 18-6184**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 01, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHNNY PHILLIPS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ANNA VALENTINE, Warden, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE: COLE, Chief Judge; and BOGGS and SUTTON, Circuit Judges.

BOGGS, Circuit Judge. Johnny Phillips shot and killed Phil Glodo in 2007 with a shotgun loaded with birdshot after a day-long argument in which Glodo had been the belligerent party. In 2009, a Kentucky jury convicted Phillips of wanton murder and sentenced him to thirty years in prison. The key evidence at trial was autopsy photographs and medical testimony showing that Glodo had been three feet away or more when the fatal shot had been fired and that he was shot directly in the back of the head between the ears. But in 2013, Phillips discovered an X-ray of the deceased Glodo's skull that was taken by the medical examiner's office and not turned over in the course of *Brady* discovery. He filed a petition for a writ of habeas corpus on this basis. Phillips argues that this X-ray shows, or could be used in conjunction with expert testimony to show, that the fatal blast was fired at an angle rather than straight-on from behind, which he further argued suggested either that there had been a struggle and that he had indeed been acting in self-defense or, alternatively, that he had not acted wantonly by pointing the gun squarely at the back of Glodo's

head and pulling the trigger. The district court denied Phillips's habeas motion, and Phillips appealed.

Since the state concedes that that the X-ray was suppressed, the appeal turns on whether the X-ray is favorable and material. *See Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010). Most of the evidence at Phillips's trial was equivocal; the physical evidence that purported to show that he had shot Glodo squarely in the back of the head, and from far enough away not to have been in a close physical struggle, was crucial. Had the X-ray been made available to Phillips at the time of his trial, that trial could have been turned into a "battle of the experts." This is different enough from what actually happened to "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). Accordingly, we reverse.

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.      The Shooting

On the evening of October 18, 2007, Johnny Phillips shot and killed Phillip Glodo. They had started that day as friends. Phillips and Glodo lived in Laurel County, Kentucky, near London. Earlier that day, they had traveled to Tennessee to get a boat license. *Phillips v. Commonwealth*, 2010 WL 2471669, at *1 (Ky. June 17, 2010). According to a mutual friend, Randy Capps, they had begun drinking even before that trip. *Ibid*. When they returned after the trip to Phillips's house, they had planned to hold a cookout. Instead, Phillips took a nap, while Glodo drank beer on the patio. Medical tests taken after Glodo's death would indicate that his blood-alcohol level had been at least 0.14 that day. It seems that when Phillips woke up, he said something that Glodo construed as accusing him (Glodo) of stealing fifty dollars from Phillips. Glodo flew into a rage and stayed in one for the rest of the day.

2

The two parted ways that afternoon with the quarrel unresolved. That evening, Phillips and his wife Angie visited the house of Randy Capps and his family. Capps was a mutual friend of both men; in fact, Glodo usually visited his house about four nights a week, while Phillips came by about once a week. Capps told Phillips that Glodo had called him repeatedly that afternoon, threatening to "kick [Phillips's] ass." As the Phillipses socialized with Capps, each man received more calls from Glodo, who told Capps that he would sic his two Great Danes on Phillips. *Phillips*, 2010 WL 2471669, at *1. Angie could hear Glodo screaming into the phone when he was talking with Phillips directly. Later, profanity-laced voicemails from Glodo would be found on Phillips's phone.

After thirty to forty-five minutes at the Cappses, Phillips and Angie left. Phillips drove his wife home, and then, leaving behind the motorcycle they had been riding, he returned to the Cappses' house alone in his pickup truck. As it would transpire, the truck had a shotgun in the back.[1] Phillips and Capps were in the driveway talking about a boat tarp; they had been there for about five to ten minutes when, just before 10 P.M., Glodo pulled up and said, "What now, MFer?" *Ibid.* Glodo and Phillips began to argue. At this point, Capps, pointing out that he had children inside, asked them to take their quarrel somewhere else. *Id.*

Phillips got into his truck and left first, heading in the direction of his house; Glodo let him out, then followed close behind. "As Phillips prepared to pull away Glodo yelled 'I'll ram your ass.'" *Phillips*, 2010 WL 2471669, at *1. Capps could hear Glodo gunning his engine as he drove after Phillips, though he doubted the former could catch the latter, as Phillips had a new truck and

---

[1] At trial, another friend of Phillips, Jerry Blanton, testified that this was Phillips's "rabbit gun," and that it would have been rare for Phillips *not* to have had a shotgun in his truck during hunting season. At the prosecution's request, the court took notice that it was not rabbit-hunting season on the night of the crime. Angie Phillips testified that Johnny Phillips had not taken anything from the house to his truck when he dropped her off, and Blanton testified that had Phillips wanted to hurt a person, he had other guns that would have been more suitable.

3

Glodo's was an older vehicle. As the two men drove down the narrow country road, two riders on horseback approached from the other direction, followed by a truck towing a large horse trailer. Phillips and Glodo pulled into the gravel parking lot of a church to allow these to pass. Once in the lot, they each exited their trucks.

Within mere minutes, Glodo lay on the ground, dying from a single gunshot wound that entered the back of his head.[2] Phillips called 911, and remained at the scene as police and paramedics arrived. A Green River fixed-blade knife was recovered from the scene; no usable fingerprints were found on it, but some DNA was recovered. This was enough to exclude Phillips as the source of the DNA but could not rule Glodo out or in. Neither man had previously been seen with that knife.[3] "[F]ollowing the shooting Phillips gave a statement to the police in which he claimed, inconsistently, that the shooting was both accidental and done in self-defense." *Phillips*, 2010 WL 2471669, at *3. In part, he said:

> It was an accident.... It really was an accident. The gun went off prematurely.
>
> I used it [the shotgun] to push him away from me and it went off.... He was standing like this at me and had something in this hand.... When he come at me.... He rushed my truck, he rushed to the side of my truck, I pushed him away from the truck with my truck door, know what I mean.... He come up to my truck. I was watching him in the mirror and they weren't moving quick enough for me to go on the horses and stuff coming down that hill.... I pushed him off, basically used my door to get some room to get out of the truck, and as I come out of the truck I come with the gun, I pulled a shotgun out beside me. I was trying to scream at him get back in your damn truck, get the hell away from me and leave me alone and he was coming like this and his hand was at his side. In this hand right here is the one he had had the knife in, all I could see was shiny chrome and he carries a .44 that long ... in that hand cause he was coming at me like this, know what I mean, with this arm extended, with his forearm like extended....

---

[2] Capps would later testify that it was two to three minutes "at the most" from when the two men left his driveway until he heard the gunshot. A witness who had been one of the men on horseback said that the gunshot came roughly thirty seconds to one minute after he passed the two trucks.

[3] Phillips produced testimony that this was unlike the sort of knife he would own, while the state evinced testimony from Randy Capps that Capps had never seen Glodo with a knife.

> That's when he come at me with his forearm, I didn't know if he was going to try and push me.... I raised that gun up cause he had that thing in his left hand when I raised the gun up. He was coming at me and I took the gun and give it that and he didn't move four inches and the gun went off.
> ...
> I swear on my mother's grave I didn't mean to shoot that man.

*Ibid.* (ellipses in original). Physical evidence produced at trial did give some indications of what happened at the scene. According to police, the two trucks were found about half a car length apart "or more." The night was very dark. Phillips told police he was standing about at the rear driver-side wheel well of his truck when the fatal shot was fired; the location of the ejected shotgun shell roughly confirmed this. Holes were found in the driver's side windshield of Glodo's truck, which the prosecution argued corresponded to shotgun pellets and therefore indicated the gun had to be pointed more level than up, though the angle of fire was not established with any great deal of precision.

### B.    Phillips's Trial

Phillips was tried in the Laurel Circuit Court on June 2 and 3, 2009. *Phillips*, 2010 WL 2471669, at *1. Prior to his trial, Phillips moved for the discovery of *Brady* evidence, including for '[a]ny results or reports of physical or mental examinations, and of scientific tests or experiments' concerning the deceased." The trial court ordered *Brady* discovery. The state turned over its autopsy report and several color photographs, but not the X-ray in question in this appeal.

At trial, the Commonwealth called Dr. Jennifer Schott, the then-state medical examiner who had performed the autopsy. The Commonwealth also showed the jury postmortem photographs of the back of Glodo's head, which, as the prosecutor put it when arguing for admission, "show[] a central location of the wound between -- you see both ears in the photo." Dr. Schott was directly examined on these photographs as they were shown to the jury. She agreed that it showed that Glodo was shot "in the back of the head" and told the jury that the wound was

"in the middle" (as opposed to on the "right-hand side [or] the left-hand side"). She also explained that a photo in which Glodo's hair had been shaved post-mortem showed markings around the wound ("satellite lesions") that indicated the spread of shotgun pellets, as the shot moved further from the mouth of the gun. This in turn indicated, she argued, that the end of the gun was "three feet or more" from Glodo's head, though she caveated that "for a definitive answer, you would need a firearms examiner."[4] (The state did produce a firearms examiner, Gareth Deskins, but not to testify to this point; rather, he testified that the shotgun used in the shooting had a normal trigger-pull weight and a functioning safety, thus rebutting any suggestion that the gun accidentally discharged.) Dr. Schott testified to the direction from which the shot had been fired:

> **Q** **Clarifying, you said you also examined the back of his head, correct.**
>
> A The pellets entered the back of his head.
>
> **Q** **Pellets. Not bullet. Pellets entered the back of his head. Did you recover some of those pellets?**
>
> A Yes. I did.
>
> **Q** **And where'd you recover them from?**
>
> A From the inside of the head.
>
> **Q** **Okay. And that would lead us to believe -- that would lead you to believe that the direction of the pellets' track?**
>
> A In general, the direction was back to front.
>
> **Q** **Meaning the back of Mr. Glodo's head to the front?**
>
> A Yes.

In addition to this physical evidence, the state introduced evidence of the inconsistencies of Phillips's story on the night of the shooting—mainly his switching back and forth between

---

[4] Somewhat incongruously, the Kentucky Court of Appeals, in Phillips's 2012 collateral attack on insufficient assistance of counsel, took a different view:

> Dr. Schott clearly stated she was not a firearms examiner; however, she testified that she had performed approximately 1200 autopsies as a medical examiner. Dr. Schott performed an examination and autopsy of the victim; consequently, we believe she was qualified to render an opinion regarding the manner in which the wounds were inflicted.

*Phillips v. Commonwealth*, 2012 WL 5457645, at *5 (Ky. Ct. App. Nov. 9, 2012).

explaining the shooting as an accident and as self-defense and inconsistencies in some of the details, such as where Glodo was shot, how far away Glodo was when shot, and how Phillips got out of his truck—both through police testimony and by playing recordings of his 911 call and police interviews. Nevertheless, the stress laid on the physical evidence that Phillips had been shot squarely in the back of the head cannot be overstated. In its opening, the Commonwealth declared that, "what we will be asking this jury to find is that the defendant is guilty of murder. We will be asking the jury to find that because the defendant intentionally took a 12-gauge shotgun, pointed it at the back of the victim's head, and pulled the trigger." At the close of Phillips's jury trial, the prosecutor addressed the jury again:

> Ladies and gentlemen, don't -- I keep saying he was shot in the back of the head. That's obvious. But don't forget what Dr. Schott told us, that the bullets were traveling from back to front, okay? That doesn't give credence to his story that he was shot from the side and grazed and took a chunk of his head off. He was shot from the back, and the bullets were from back to forward -- the pellets did, not bullets. But the pellets went from back to forward, which means that shotgun was fired directly from his back into his head. That is intentional murder.

The jury found Phillips guilty of wanton murder, the next charge down, not intentional murder. But the basis for the wanton-murder instruction was that Phillips had "*point[ed]* a loaded gun at somebody's head."[5] (Emphasis added.) Moreover, the instructions for wanton murder required "circumstances manifesting in [sic] extreme indifference to human life." It is hard to see how the prosecution's argument that "the pellets went from back to forward, which means that shotgun was fired directly from his back into his head" would not therefore have gone to this charge as well as that of intentional murder.

---

[5] The prosecution's closing argument does not contain a clear separate argument for why Phillips should be found guilty of wanton murder, as opposed to the intentional-murder argument just quoted. Nevertheless, in explaining the meaning of the charges to the jury, the prosecutor said, "Anytime you pull a loaded gun on somebody, we all know what could happen. We all know the worst-case scenario is that gun goes off, okay? If you think that's what happened, he's guilty of wanton murder."

The defense theory at trial was, as Phillips now describes it, that:

> Glodo had been shot during a physical altercation that he had initiated. According to defense counsel, Glodo had attacked Phillips with the knife found at the scene after threatening him throughout the day and into the night. Phillips, acting in self-defense, attempted to push Glodo away with his gun, and a struggle in the dark ensued. Phillips's gun went off, and Glodo was killed. To support that theory, defense counsel pointed to statements Phillips made to the 911 dispatcher and to the detective that he believed he may have shot Glodo in the face, upper torso, or chest, suggesting that Phillips had no idea that he had shot Glodo in the back of the head.

Brief for Petitioner at 10–11 (record citations omitted). Phillips was helped by the extensive testimony from prosecution witness Randy Capps and defense witness Angie Phillips showing that Glodo had been the belligerent one all day. On the other hand, he was hampered by the fact that both his statements on the night of the shooting and his counsel's argument at trial continued to equivocate over whether the shooting had been accidental or self-defense. The biggest problem, as Phillips now points out, is that "the defense lacked any evidence to challenge the centerpiece of the Commonwealth's case—Dr. Schott's testimony regarding the gunshot wound in the back of Glodo's head."

The jury was given instructions on (intentional) murder,[6] wanton murder,[7] second-degree manslaughter,[8] and reckless homicide.[9] The jury found him guilty of wanton murder after a brief, same-day deliberation, and then deliberated again and arrived at a sentence of thirty years. Phillips appealed as of right to the Kentucky Supreme Court, which upheld his conviction and sentence. *Phillips*, 2010 WL 2471669.

### C.      State and Federal Post-Conviction Proceedings

In 2011, Phillips filed a collateral challenge to his conviction in the Kentucky state courts. *Phillips v. Commonwealth*, 2012 WL 5457645, at *2 (Ky. Ct. App. Nov. 9, 2012). As part of this

---

[6] "Instruction number 5, 'Murder,' 'You will find the defendant guilty of murder under this instruction if and only if you believe from the evidence beyond a reasonable doubt all of the following: That in this county on or about October 18, 2007, and before the finding of the indictment herein, he killed Phillip Glodo by shooting him with a shotgun and that in so doing he caused the death of Phillip Glodo intentionally and that in so doing he was not privileged to act in self-protection.'"

[7] "Instruction number 6, 'Murder,' [sic] 'If you do not find the defendant guilty under instruction number 5, you will find the defendant guilty of murder under this instruction if and only if you believe from the evidence beyond a reasonable doubt all of the following: That in this county on or about October 18, 2007, and before the finding of the indictment herein, he killed Phillip Glodo by shooting him with a shotgun and that in so doing he was wantonly engaging in conduct which created a grave risk of danger to another and thereby caused the death of Phillip Glodo under circumstances manifesting in extreme indifference to human life and that he was not privileged to act in self-protection.'"

[8] "Instruction number 7, 'Second-Degree Manslaughter,' 'If you do not find the defendant guilty under either instruction number 5 or number 6 you will find the defendant guilty of second-degree manslaughter under this instruction if and only if you believe from the evidence beyond a reasonable doubt all of the following: That in this county on or about October 18, 2007, and before the finding of the indictment herein, he killed Phillip Glodo by shooting him with a shotgun and that in so doing though otherwise privileged to act in self-protection, the defendant was mistaken in his belief that it was necessary to use physical force against Phillip Glodo in self-protection or in his belief in the degree of force necessary to protect himself, and that when he killed Phillip Glodo he was aware and consciously disregarded a substantial and unjustifiable risk that he was mistaken in that belief and that his disregard of that risk constituted a gross deviation from the standard of care that a reasonable person would've observed in the same situation.'"

[9] "Instruction number 8, 'Reckless Homicide,' 'If you do not find the defendant guilty under instruction number 5, number 6, or number 7, you will find the defendant guilty of reckless homicide under this instruction if and only if you believe from the evidence beyond a reasonable doubt all the following: That in this county on or about October 18, 2007, and before the finding of the indictment herein, he killed Phillip Glodo by shooting him with a shotgun and that in so doing, though otherwise privileged to act in self-protection the defendant was mistaken in his belief that it was necessary to use physical force against Phillip Glodo in self-protection, or in his belief in the degree of force necessary to protect himself, and that when he killed Phillip Glodo he failed to perceive a substantial and unjustifiable risk that he was mistaken in that belief and that his failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would've observed in the same situation.'"

challenge, Phillips engaged forensic scientist Larry Dehus, who raised the possibility that X-rays would have been taken of Glodo's skull at autopsy. The state denied that any such X-ray existed, and the Kentucky Court of Appeals ultimately rejected the argument as procedurally barred. *Phillips*, 2012 WL 5457645, at \*4.

In 2013, however, a state open-records request filed on Phillips's behalf revealed that such an X-ray did exist, and in April 2014, the state turned it over. Phillips thereupon brought a *Brady* claim in state court; this was rejected on the grounds that such an argument should have been raised on direct appeal. *Phillips v. Commonwealth*, 2016 WL 2894026, at \*3 (Ky. Ct. App. May 13, 2016).

Phillips then turned his efforts to federal court, where he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, based (in pertinent part) on the *Brady* violation. A magistrate judge initially recommended denying Phillips's claim. The district court reversed the magistrate judge and ordered an evidentiary hearing on the significance of the X-ray.

At that evidentiary hearing, the Commonwealth produced as its sole witness Dr. Jennifer Schott, the coroner and forensic pathologist who testified at Phillips's trial, while Phillips's attorney produced forensic scientist Larry Dehus, who had first anticipated the existence of the X-ray in Phillips's 2011 challenge. Some problems resulted from this mismatch of specialties. Dr. Schott echoed testimony she had given at trial and conceded that she was not a firearms expert. Dehus was forced to admit that, not being a doctor, he was not properly trained in reading X-rays. In particular, Dehus stated (in response to a question from the court) that the X-ray was taken from the back of the head up toward the face, but Dr. Schott pointed out that the X-ray had been taken from the face down toward the back of the head. (Dehus doubled and then tripled down on his contention.) The district court, meanwhile, at certain times seemed to misapprehend the standard

by which *Brady* evidence is to be evaluated, framing the inquiry as one into the sufficiency of the evidence: "What I'm interested in learning is, how does this x-ray change anything? Why is it or is it not *material to the medical examiner's determination*? . . . . And let's talk about . . . whether or not that even differs with her original testimony." (Emphasis added.)

> The heart of Dehus's testimony concerned the X-ray:
>
> A.  . . . . The opaque particles are pieces of shot.
>
> Q. And are you familiar with the type of projectile that was used in this case?
>
> A. It was birdshot ammunition, yes.
>
> Q. Explain to the Court what birdshot is.
>
> A. Well, it's a large number of small BBs. And I think indicated, when I read the report, about .12 inches in diameter. And depending on the size of the load, there could be anywhere from 170 to 220 pellets in that type of birdshot.
>
> Q. And it would be fair to say that the x-ray that we have, there's not 200 birdshot in the skull, is there?
>
> A. It certainly doesn't appear to be that number. It's not possible from the x-ray to individually count each pellet. But it doesn't seem -- it *doesn't appear to be anywhere near that number*.

(Emphasis added.) Phillips's attorney also elicited testimony confirming that shot had not exited through the front of Glodo's skull. From this, and from the lack of shotgun wadding on the X-ray,[10] Dehus concluded that Glodo must have been shot at an angle. (As the district court pointed out in its opinion after the hearing, the wadding and exit wound testimony are procedurally barred from being a basis for relief, because both were knowable prior to the discovery of the X-ray.)[11] On

---

[10] Dehus argued that, "There is no mention of the recovery of the plastic shotgun wadding from the wound or any mention of it being found in the area of the scene. If a -- in a direct shot to the back of a head at a distance of three feet, a wound would be expected -- it would be expected that the plastic shotgun wadding would travel with the shot and enter the wound in the head."

[11] Dehus had had access in 2011 to both the autopsy report and autopsy photographs, from which the exit-wound and wadding points could be gleaned. Indeed, Dehus appear to have made them in the report he made in support of Phillips's 2011 state collateral challenge. The Kentucky Court of Appeals rejected an ineffective-assistance-of-counsel challenge based on the failure to hire a ballistics expert at the time of the original trial; the opinion specifies that only Phillips's "own conflicting statements" were provided as evidence for this theory. *Phillips*, 2012 WL 5457645, at *4.

redirect, Dehus would go on to opine that, indeed, the direction of the shot could be determined from the X-ray itself:

> Q. What does the x-ray show you as a ballistics person?
>
> A. If you know where the entrance wound is and you know where the bullet or the majority of the shot ends up, then that can give you an indication of the direction of travel of the bullet or shot in the body.
>
> Q. And in this case, did it show you that?
>
> A. Yes.
>
> Q. What direction did it show you?
>
> A. In my opinion, it's -- the shot ended up in the right side of the head, and the entrance was towards the left side of the head.

Finally, it is worth noting that in both his argument to the court and his direct- and cross-examinations, Phillips's counsel repeatedly seemed to conflate angle (whether the shot was fired straight-on or from an angle) and distance (whether the muzzle was closer to or further from Glodo's skull). So too did Dehus and Phillips himself (who spoke briefly at this hearing). Each used the phrase "execution style" to characterize "walking up behind the individual and shooting squarely in the back of the head" This phrase, and indeed this concept, was not used at the original trial—and it would come back to bite them.

For the Commonwealth, Dr. Schott testified that, in keeping with standard practice for gunshot wound victims, the state's autopsy technicians would have taken the X-ray before she performed her autopsy. The X-ray was taken to tell what kind of projectile—shot or bullets—was in the skull pre-autopsy. She also testified that during the autopsy, she had recovered 19 pellets as a representative sample "for the purpose of them being examined" by the crime lab. Dr. Schott emphasized that as the X-ray was only a two-dimensional image, without another X-ray from the side, she could not tell the exact location of any shot. Therefore, she said, the X-ray had "no bearing on direction of the injury." When asked, "can you tell from the x-ray how many pellets are -- in

the head[,]" she responded, "[n]o." Dr. Schott did not testify directly one way or the other to whether all the shot one would expect was there; on cross-examination her position was that she could not speak to firearms questions, and thus that position prevented her from reaching the question. The state also seemed at pains to affirm that Dr. Schott still believed the victim to have been shot "in the back of the head." Dr. Schott confirmed there was no exit wound.

After the hearing, the district court ruled that "the x-ray is not favorable to the defendant. Nor is it material." *Phillips v. Valentine*, 2018 WL 4976801, at *2 (E.D. Ky. Oct. 15, 2018). First, it set aside information that could have been obtained before the discovery of the X-ray. Then, the court found that what was left was the X-ray evidence bearing on, as Dehus had put it, "the 'direction of the shot and the relative quantity of the shot.'" The heart of the district court's opinion is that:

> Dehus's testimony about the significance of the x-ray is not reliable. He testified that "as best [he could] tell," the x-ray was taken from the back of Glodo's head. (DE 137, Tr. at 19, 20-21, 50.) Jennifer Schott, the medical doctor who performed the autopsy of Glodo, however, testified that the x-ray was taken front to back. (DE 137, Tr. at 31.) Dehus conceded that he was not qualified to say whether the x-ray was taken from the front or the back because his is not a medical doctor. (DE 137, Tr. at 52.) Dr. Schott is a medical doctor. Further, she served as the medical examiner for the Kentucky Department of Justice (Pf. Ex. I, Tr. at 2-3) and would necessarily be more familiar with its procedures. Thus, her testimony on the angle of the x-ray is more credible. Because Dehus believed the x-ray was taken from the back of Glodo's head, any conclusions that he drew from the x-ray are unreliable.
>
> Even assuming, however, that Dehus's opinion is correct and that Glodo was shot from behind at an angle and at a distance, that does not undermine confidence in the jury's finding that Phillips committed wanton murder. A person is guilty of wanton murder under Kentucky law when he "wantonly engages in conduct which creates a grave risk of death to another person and thereby causes" the person's death. KRS § 507.020(1)(b). Evidence that Phillips shot Glodo from behind at a distance is not inconsistent with the jury's verdict. Wanton murder does not require a finding that Glodo was shot "execution style" in the back of the head. If anything, evidence that Phillips shot Glodo in the back of the head from a distance contradicts Phillips' claim that he shot Glodo in self-defense. Further, Dr. Schott did not testify at trial that Glodo was shot "execution style." In the portion of the trial testimony that Phillips provided the Court at the hearing, Dr. Schott, testified that Glodo was

13

shot at "three feet distance or more." (DE 137, Tr. at 39; Pf. Ex. I, Tr. at 13; DE 30-7, Com. Bf. at 13.)

For all these reasons, the Court does not find the x-ray favorable to Phillips or material to his guilt.

*Id.* at \*4–5. The district court thus denied the petition for the writ of habeas corpus but granted a certificate of appealability as to the *Brady* issue. The matter is now before us.

## II.     STANDARD OF REVIEW

This is a habeas proceeding following an evidentiary hearing. Therefore, we review the district court's conclusions of law and of mixed questions of law and fact *de novo*, while reviewing its factual findings for clear error. *King v. Westbrooks*, 847 F.3d 788, 795 (6th Cir. 2017); *see also Bennett v. Brewer*, 940 F.3d 279, 286 (6th Cir. 2019).

The Kentucky state courts held that Phillips's *Brady* claim had been procedurally defaulted on appeal. Therefore, Phillips must demonstrate both cause for the default and prejudice from the alleged constitutional error. *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010). Where the error is a *Brady* violation, however, the test for assessing cause and prejudice merges into the test for assessing the *Brady* claim on the merits:

> To demonstrate a Brady violation, a habeas petitioner must establish three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). A habeas petitioner demonstrates prejudice by showing that the suppressed evidence is "material." *Id.* at 282, 119 S.Ct. 1936.
>
> A state's suppression of Brady evidence constitutes cause under the procedural-default doctrine. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). The prejudice prong for both analyses is the same. *Id.* Thus, a petitioner who proves a Brady violation demonstrates cause and prejudice to excuse procedural default of the Brady claim. *Id.*

*Brooks*, 626 F.3d at 890–91.

14

### III.    ANALYSIS

### A.    The X-Ray Was Suppressed

To take the easiest question first, there is no question that the X-ray was suppressed. The government itself acknowledges "the prosecution's inadvertent suppression of the X-ray of the victim's head[.]" *Brady* does not require that the suppression be deliberate. *Strickler*, 527 U.S. at 281–82; *see also Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 465 (6th Cir. 2015). Nor does *Brady* require that the prosecutor's office have had knowledge or possession of the material at the time of trial. *See id.* at 281. (In our case, the Commonwealth maintains that prosecutors denied the existence of the X-ray before the courts in 2013 because it never knew that the X-ray existed. The Commonwealth's current attorney admitted at the evidentiary hearing, however, that this was only speculation.

The Commonwealth admits on appeal that, "Phillips has established cause for the default in that the X-ray was not turned over to Phillips until an open records request was made." As we have seen, "cause for the default" and the *Brady* suppression inquiry are the same. *Brooks*, 626 F.3d at 890–91. Therefore, the government has conceded the suppression element of the *Brady* test.

### B.    The X-Ray Was Favorable

Phillips's argument is that the X-ray shows that there was far less shot in Glodo's skull than one would expect had the fatal blast been fired straight-on from behind, as the prosecution alleged at trial. The blast, in other words, must have been at an angle, so that only some of the shot emitted from the shotgun entered his skull. This in turn, Phillips argues, shows—or would have allowed him to argue at trial—that the prosecution's theory of the case was incorrect, and that physical evidence corroborated Phillips's tale of self-defense. The evidence could have been used

for impeachment of prosecution witnesses (Dr. Schott and forensic examiner Deskins) as well as to serve as the basis for expert testimony in the plaintiff's case-in-chief. The X-ray evidence and the argument built from it, finally, would have played a role in mitigation, as well as exculpation. Without it, jurors convicted Phillips of the second-most-serious crime charged; with it, even if he were not acquitted, perhaps they would have found him guilty only of a lesser included offense.

We evaluate the argument just outlined through two discrete parts of the *Brady* test. The first, which asks whether the X-ray was "favorable" "asks only which party the evidence favors." *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019). Evidence providing an alternative explanation of how the decedent died or undermining the prosecution's theory of the case is favorable. *See, e.g.*, *Jamison v.* Collins, 291 F.3d 380, 385 (6th Cir. 2002). Moreover, because the favorability inquiry "asks *only* which party the evidence favors," *Clark*, 934 F.3d at 492 (emphasis added), credibility inquiries are not appropriate at this stage. *Ibid.* Normally, the question of credibility arises in the context of witness testimony. *See, e.g.*, *ibid.* In our case, however, we have an X-ray that does not 'speak for itself,' particularly to those not trained to read one. For this exact reason, the district court had originally ordered an evidentiary hearing, observing that "the Court lacks a medical degree and cannot on its own determine what [the X-ray] shows." As we have seen, at that evidentiary hearing, the Commonwealth produced Dr. Schott as its sole witness, while Phillips produced forensic scientist Dehus. In making its determinations, the district court appears to have equated the *value* of the X-ray with the *credibility* of the expert witnesses. The court then used the question of which direction the X-ray was taken from (about which the court questioned both witnesses) as a touchstone for which witness was more credible.

Dehus's mistake as to the direction of the X-ray is damaging, as is his insistent doubling-down in the face of medical testimony to the contrary. However, when stripped of matters we

16

cannot now take into account (such as the wadding issue, or the lack of marring of Glodo's face) and of matters on which Dr. Schott rebutted him (his over-confident statements regarding the direction of the shot, given her points about inability to trace this in a 2-D image), the heart of his testimony is: 1) There were 170 to 220 pieces of shot in the shell that was fired. 2) Had the shell been fired straight-on at the distance indicated, these should all have wound up in Glodo's skull. 3) The X-ray does not show anywhere near that number in Glodo's skull. 4) Therefore, the shot must have been fired at an angle. It is upon the third of these points—whether or not the X-ray shows what one would expect to see—that the question of favorability turns.[12] Here, it seems noteworthy that Dr. Schott did *not* rebut this point directly. She testified that she could not tell "from the x-ray how many pellets are . . . in the head[.]" But elsewhere, she stated that X-rays of this type "give me a general idea of the distribution of the pellets or of the bullet."

Given how X-rays work, there would be a significant and visible difference between an X-ray of a skull with a full load of 170-220 metal pellets in it (or nearly that many) and one with far fewer than that. That observation was the heart of Dehus's argument: "It's not possible from the x-ray to individually count each pellet. But it doesn't seem -- it doesn't appear to be anywhere near that number." As Dr. Schott herself admitted (indeed, argued), the X-ray is a two-dimensional photograph. Therefore, Dehus's error as to whether it had been taken from the front or the back does not seem to affect the basic ability to argue such points as the density of shot shown. Even with Dehus's skill somewhat in question, we conclude that we cannot dismiss his basic conclusion that there was not nearly enough shot in the skull to support the Commonwealth's theory. Or to put it another way, the X-ray provides some support for Phillips's theory. We particularly cannot

---

[12] Dr. Schott admitted that she was not qualified to address the first point, but at trial, the state's firearms witness gave testimony suggesting this general type of shell might have "2 or 300 shot" shot in it. Thus, we can take Dehus's testimony on this point as relatively uncontested. The state produced no evidence—nor argued—to suggest the second point is wrong, at least as to the vast majority of the shot.

discount this conclusion in view of the Commonwealth's and Dr. Schott's inability to rebut it directly.

Phillips also developed—better on appeal than at the evidentiary hearing—a second, somewhat weaker argument: It is possible to use the X-ray to tell if the shot was fired at an angle or straight-on based solely on the distribution of the shot in the X-ray in terms of being on or off-center. This is subject to similar analysis as that above about the sheer quantity of shot. Dr. Schott demonstrated at the evidentiary hearing why the 2-D image could not be used to trace the directionality of any given pellet. But if the mass of the pellets is to one side, that would suggest that they were fired at an angle. As Phillips points out, the mistake over whether the X-ray was taken back-to-front or front-to-back would not matter for this inquiry, because either way, off-centeredness would remain. But Dehus's testimony at the evidentiary hearing was less well developed on whether this was so than in the case of the sheer-quantity argument above.

As to the district court's equating Dehus's credibility with the value of the X-ray, had Dehus's testimony itself been the *Brady* material, this kind of credibility judgement would have been inappropriate. *Cf. Clark*, 934 F.3d at 492. Here, however, we are in a somewhat anomalous situation: The *Brady* material is the X-ray itself, and as an inanimate object, it does not present a "credibility" question in the usual sense—but on the other hand, most judges cannot evaluate it without an expert intermediary. Thus, as compared to *Clark*, this situation poses a slightly different question: what is the role of the court in evaluating the credibility of the experts who will help it evaluate the meaning (rather than the credibility) of the *Brady* material?

On the one hand, courts perform a screening role constantly as to expert credibility, both before testimony is given at trial and in evidentiary hearings. Such a role, to some extent, seems necessary here: obviously, it would be a recipe for chaos (and injustice) if courts were obligated

to accept as true any testimony, no matter how blatantly incorrect and self-serving, regarding the value of a supposed piece of *Brady* evidence. On the other hand, however, we have recognized "the Supreme Court's directive that 'the criminal trial . . . [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" *Clark*, 934 F.3d at 492 (quoting *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) (quoting *United States v. Jernigan*, 492 F.3d 1050, 1056–57 (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 440) (brackets in original))). If the evidence suffices to create a battle of the experts, such a battle should be waged at trial, not simply before a judge in a post-hoc setting.

There are good reasons to think that the threshold for the favorability inquiry should be fairly low. Most of the key cases treat it only glancingly[13] or even omit to discuss it.[14] (We note, however, that this is likely due to the fact that the *Brady* material in question is usually either testimony or police notes that, if believed, are obviously favorable.) The physical evidence here obviously does not have an innate credibility problem, and nor was the testimony surrounding it blatantly self-serving or dishonest. To the contrary, despite an unfortunate misstep or two, it made out the "favorability," in the *Brady* sense, of the X-ray evidence to Phillips. In short, we hold that the evidence was favorable, and thus we move on to materiality.

### C.    The X-Ray Was Material

The materiality inquiry asks if there is a "'reasonable probability' of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict *worthy of confidence*." *Kyles*, 514 U.S. at 434 (emphasis added); *see also*

---

[13] *See, e.g. Banks*, 540 U.S. at 691; *Clark*, 934 F.3d at 492.

[14] *See, e.g. United States v. Tavera,* 719 F.3d 705, 710–11 (6th Cir. 2013).

19

*Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). "A 'reasonable probability' of a different result" is said to have been demonstrated "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). We are warned, moreover, not to conflate materiality with the sufficiency-of-the-evidence inquiry. *Kyles*, 514 U.S. at 434–45; *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014). In particular, "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Bies*, 775 F.3d at 399 (quoting *Kyles*, 514 U.S. at 434–45).

In assessing this part of the *Brady* analysis, it is important to note how equivocal much of the evidence at Phillips's trial was. For most of the two days, including from many of the prosecution witnesses, the jury heard at length about *Glodo's* anger and aggression that day. But Dr. Schott's testimony, and her explanation of the photographs of the back of Glodo's skull, appeared to show as a matter of uncontroverted fact that Glodo had been shot squarely from behind (and from a distance of over three feet away). These, combined with Phillips's inconsistent explanations on the day of the shooting—characterizing the shooting on the 911 call and in a police interview as both an accident and self-defense—were, on our reading of the trial transcript, the key turning points. Here was the indisputable (or so it seemed) evidence: Phillips had raised a shotgun, aimed it squarely at the back of Glodo's head when there was a distance of at least three feet between them, and pulled the trigger. No matter what had come before, that is not self-defense, and it is very hard to square with accident. As we have seen, the prosecution strongly emphasized this key point in both its opening and closing arguments.

Viewed in this light, it is easy to see how different the trial could have been had Phillips had the X-ray and expert(s)—firearms and, perhaps, medical—of his own. Instead of an equivocal

case swayed by one piece of indisputable evidence, the jury would have seen an equivocal case plus a battle of the experts. Relying on the X-ray, Phillips could have produced an expert to testify that the physical evidence was consistent with his account of a glancing shot, fired in the course of a struggle. Phillips may also have called a medical examiner, so as to have covered some of the weaknesses that Dehus, alone, clearly created.

His counsel could also have used the X-ray for impeachment purposes. Dr. Schott testified at the trial that, based on the pellets she recovered from inside Glodo's head, "the direction [of the pellet's track] was back to front." Phillips's counsel could have impeached this conclusion on the basis of the X-ray. Moreover, Dr. Schott testified at the evidentiary hearing that, during the autopsy and after her technician had taken the X-ray, she recovered only a sample (19, out of an unknown total) of the pellets in the head so that these could be submitted to the police lab for examination. As we have seen, she strongly disclaimed the ability to track the direction of the shot on the basis of the X-ray, saying that it had "no bearing on the direction of the injury." Introducing the X-ray would have allowed the defense to cross-examine Dr. Schott as to why she was so confident that this representative recovery, conducted to obtain material for ballistic analysis, allowed her to reconstruct the path of the shot, while finding no use at all for the X-ray in this regard. Similarly, the X-ray could have been used to weaken Dr. Schott's testimony regarding the photograph, showing the central location of the wound: the argument presumably would be that though the entry wound was in the middle of the back of the head, the X-ray showed that the shot had been at an angle, not straight-on.

The Commonwealth also called a firearms expert at trial for the purpose of showing that the trigger and safety of the shotgun worked normally. Phillips outlines to us the line of questioning on cross-examination of this witness that the X-ray would have made possible:

> Apprised of the x-ray of Glodo's skull, counsel could have elicited compelling testimony from Deskins that Glodo had been struck at a significant angle. Counsel could have asked Deskins to count the number of pellets in the x-ray, and compare that number to the number in the shell. Counsel could have asked Deskins about the pattern of pellets in the x-ray, and compare that to the normal pattern of distribution of shotgun pellets. Finally, counsel could have asked the ultimate question—whether the x-ray indicated a direct shot or an angled shot.

Brief of Appellant at 34. Moreover, as Phillips now points out, the availability of these lines of cross-examination liberates the value of the X-ray (to some degree) from the credibility of Dehus: with the X-ray alone, such lines of cross-examination would have been possible. After all, it is our confidence in the *trial*, not our confidence in *Dehus's* testimony, that is the question before us today.

There is also the role this evidence might have played in mitigation. *Brady* evidence need only be material to *either* guilt or punishment. *Strickler*, 527 U.S. at 280. Phillips was charged with intentional murder, wanton murder, second-degree manslaughter, and reckless homicide. (*See supra*, p. 9 & nn.6–9.) The two lesser-included charges, below that of which Phillips was convicted, have self-defense elements.[15] So if the jurors believed that the X-ray indicated the shot was at an angle, and agreed that such a fact indicated that there had been a struggle, then even if they were not convinced that this evidence was wholly exculpatory, they may well have decided that it showed imperfect self-defense and so "mitigated" down to a lesser charge. This would be "mitigation" in only the colloquial sense: really, the jury would be finding him innocent of one charge (wanton murder) and guilty of another, lesser charge.

---

[15] These were the reckless-homicide and second-degree-manslaughter charges, respectively. *See* nn.8 & 9 *supra.* Each is a type of imperfect self-defense. In each, the defendant had to a) be entitled to act in self-defense; but b) be mistaken in his belief that it was necessary to use force or to use the degree of force employed. In the case of second-degree manslaughter, the jurors would also have to find he was "*aware and consciously disregarded* a substantial and unjustifiable risk that he was mistaken in that belief" and that his disregard was grossly unreasonable. In the case of reckless homicide, that "*he failed to perceive* a substantial and unjustifiable risk that he was mistaken in that belief" and that his disregard was grossly unreasonable.

But it is quite conceivable, alternatively, that they might have mitigated in the technically accurate sense. As Phillips argues:

> Evidence tending to prove that Phillips did not shoot Glodo directly in the back of the head, but rather at a significant angle, would have mitigated Phillips's conduct and likely convinced jurors to impose a more lenient sentence at or near the twenty-year mandatory minimum sentence for the crime of wanton murder.

This argument also undermines confidence in the sentencing decision. When the jury convicted Phillips of wanton murder, they likely found that the discharge was indeed accidental, but that raising a loaded gun and pointing it squarely at the back of a man's head was wanton behavior. For that reason, evidence indicating that the gun was not *leveled* at Glodo might have gone a long way to mitigate the penalty. A gun held in his general direction, and a nervous slip of the finger, would be very different than taking dead-aim at the back of Glodo's head. Thus, a jury that was provided with the X-ray might well have sentenced Phillips to fewer than the thirty years chosen by the jury.

We have not, we must note, been able to find a case in which *Strickler*'s instruction that *Brady* is material to punishment as well as guilt, 527 U.S. at 280, has been applied outside the capital context. Were we ruling solely on this basis, that might give us more pause. However, as pointed out above, this is not the sole basis for our ruling; moreover, the Supreme Court is clear on this rule, even if it has not been broadly applied.

The state argues that notwithstanding the X-ray, the evidence showed that Phillips returned to Capps's house, where Glodo was to be found about four nights a week, with a loaded gun in his car; that he got out of his car in the parking lot and that shortly before the fatal shots were fired, he was using a loaded gun to fend off Glodo, and that the gun must have been at least relatively level since holes, arguably from some of the shot, were found in Glodo's windshield. *Cf. Phillips*, 2012 WL 5457645, at *5. This, the argument then goes, was enough for the jury to find him guilty

of wanton murder, defined as "wantonly engaging in conduct which created a grave risk of danger to another and [shooting him] . . . under circumstances manifesting in extreme indifference to human life," regardless of the X-ray. The district court found this argument persuasive, concluding that: "Even assuming . . . that Dehus's opinion is correct and that Glodo was shot from behind at an angle and at a distance, that does not undermine confidence in the jury's finding that Phillips committed wanton murder." *Phillips,* 2018 WL 4976801, at *5.

The problem, however, is that this is precisely the form a sufficiency-of-the-evidence analysis takes, and the Supreme Court has told us explicitly that the *Brady* inquiry is not to be equated to such a test. The district court framed the question as whether it could reconcile the new evidence with jury's verdict, rather than whether, in light of the new evidence, it still had confidence in "the outcome of the trial." *Kyles,* 514 U.S. at 434. Compare the statement of the district court that *"*[e]vidence that Phillips shot Glodo from behind at a distance is *not inconsistent* with the jury's verdict," *Phillips*, 2018 WL 4976801, at *5 (emphasis added), with that of the Supreme Court that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–45. It was error for the district court to rule on this basis.

The dissent ably presents the case for how a good prosecutor could still have obtained a conviction for wanton murder and a 30-year sentence. The proper legal question, however, is whether the X-ray is "material" in the sense that it undermines our confidence in the course of the trial, not that it requires a conclusion that the outcome would necessarily have been different, or even that it is 50.1% likely that there would have been a different outcome. If there is to be a battle of the documents from the record, the reader is invited to consider whether, as a defense attorney, you would rather go to the jury with only the dissent's photo (Dissent Appendix A), and

accompanying testimony; or with the jury also having access to the X-ray (Appendix A to this opinion), and the best accompanying testimony, cross-examination, and argument that could be based on the X-ray ("Where are all the pellets?"). The answer would seem obvious. And as a prosecutor, would you feel that you still could obtain the same conviction and sentence, but you would prefer that the defense not have the X-ray? Again, the answer is clear.

The jury's verdict required it to find that Phillips was not privileged to act in self-protection, which is easier to find when there is a full-on shot to the back of the head. It is easier to find reasonable doubt on that point if Phillips's theory of a struggle and pushing Glodo away is buttressed by evidence that the shot was at a slanting angle. You may consider it a judgment call as to *how much* better it would be for the defense attorney, and *how much* harder for the prosecutor, but there is no gainsaying the direction of effect. It is our task to make the call of how much it takes to "undermine confidence." Under the facts and law, as shown above, our confidence is not destroyed but it is undermined.

As a final word, we also find convincing our recent case *Carusone v. Warden, N. Cent. Corr. Inst.*, 966 F.3d 474 (6th Cir. 2020). Carusone had been in a fight over money with another man, whom he admittedly stabbed at least once in the arm and once in the chest; the other man died. *Id.* at 476. The state tried and convicted Carusone "exclusively on the theory—as the prosecution repeatedly emphasized in its closing argument at trial—that Carusone 'plunged [a] knife into the victim's heart.'" *Id.* at 475. Later, "Carusone discovered that the State had withheld five pages of the hospital's records (including the ER doctor's report *and a chest x-ray*) . . . ." *Id.* at 476–77 (emphasis added). This *Brady* evidence showed that the hole in the side of the victim's heart was consistent with a needle used at the hospital to drain blood from around his heart ("pericardiocentesis"). *Ibid*. The victim had actually died of a heart attack induced by drugs, stress,

and the fight with the Carusone. *Id.* at 477. In state post-conviction relief proceedings, Carusone produced somewhat better expert testimony than we have in this case, and the state court acknowledged that he had "plainly discredit[ed]" the theory that the state had relied upon at trial. *Id.* at 475 (brackets in original); *see id.* at 477. But the state appeals court applied *Brady* as though it were a sufficiency-of-the-evidence test: It upheld the conviction on an alternate theory that the struggle with Carusone had led, in part, to the fatal heart attack. *Id.* at 478–79. We granted Carusone a writ of habeas corpus, noting that "the test for materiality under *Brady* 'is not a sufficiency of evidence test'" but rather that "the suppressed evidence 'undermine[s] confidence in the verdict.'" *Id.* at 479 (quoting *Kyles*, 514 U.S. at 434, 435) (brackets in original).

The parallels to our case are plain. Kentucky relied "exclusively on the theory"—which "the prosecution repeatedly emphasized in its closing argument at trial"—that Phillips had shot Glodo "directly from his back into his head." *Carusone*, 966 F.3d at 474. Like Carusone, Phillips later discovered an X-ray that called this theory into serious question. And the Ohio courts in Carusone's case erroneously treated the *Brady* inquiry as a sufficiency-of-the-evidence inquiry, just as the district court did here. But that is *not* the correct inquiry. *Kyles*, 514 U.S. at 434. If the prosecution suppressed evidence, inadvertently or otherwise, that calls into serious question the theory of death in a murder trial—as it did here and in *Carusone*—we cannot simply hand-wave that away. We hold that there has been a material *Brady* violation.

We are reluctant to undo a jury verdict finding someone guilty of such a serious crime. That is particularly true in a situation like this one, where so much of the case turned on the jury's judgment as to what was in someone's mind and, to a lesser extent, on an understanding of local conditions and culture. But we are convinced that, had Phillips had the X-ray to rely on, the course

26

of his trial would likely have been quite different. We are not, in short, "confiden[t] in the outcome of the [original] trial." *Ibid*.

## IV.    CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the court below and **REMAND** with instructions to grant a conditional writ of habeas corpus, ordering the state to either retry or release Phillips.

**Appendix A to opinion of Boggs, J.**



A-407

SUTTON, Circuit Judge, dissenting. In this harmless error case about the materiality of an x-ray, there is much to say, as I will say over the next few pages. But nothing shows the harmlessness of this omission more than the picture of the back of Phillip Glodo's head, the victim of the crime. See it for yourself at Appendix A. Read what you wish, but nothing illustrates my points better than the picture itself.

No one doubts that Johnny Phillips shot and killed Glodo. And no one doubts that, when the State neglected to provide Phillips with an x-ray of Glodo's skull, it legitimately exposed itself to this *Brady* claim. But a governmental mistake of this ilk, all agree, does not by itself entitle Phillips to habeas relief. Phillips had to show that the x-ray's suppression cast "the whole" of his trial in "such a different light as to undermine confidence in the [jury's] verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Phillips cannot do that. The suppressed x-ray does not support his defense. Its introduction at trial indeed would have worsened his lot. With respect, I see no basis for vacating his conviction.

Jurors at this murder trial heard two different accounts of what transpired on October 18, 2007, in the parking lot of Star of Bethlehem Church in Laurel, Kentucky.

From Phillips' vantage point, the jurors heard that Glodo charged him with a knife while he clutched a loaded shotgun. The two grappled in close quarters, and during this altercation Phillips shot and killed him. Phillips at first called the shooting an accident but later changed his mind and described it as an act of self-defense.

From the victim's vantage point, jurors heard—and saw through Appendix A—that Phillips shot Glodo in the back of his head. He did so from a distance of at least three feet measured muzzle to cranium—and at least five feet counting the length of the shotgun's barrel. That, the prosecution argued, amounts to murder, not an accident or self-defense.

As between these accounts, the jury voted to convict Phillips of wanton, but not intentional, murder. That was sensible. And the forensic evidence leaves no room for doubt to this day.

Where does the suppressed x-ray come in? Mostly in support of the State's case. Phillips built much of his defense around the supposed proximity between him and Glodo. In his original interview with the police, he claimed to shoot Glodo from just four inches away. At trial, Phillips argued that he and Glodo stood "close together" and remained "next to each other" when the gun went off. ROA at 88–89. The x-ray undermines those claims. According to Larry Dehus, Phillips' expert witness, the x-ray confirms that Phillips shot Glodo from a distance of at least three feet and likely four feet or more. That coincides with the estimates the State's expert witness, Dr. Jennifer Schott, provided of "three feet distance or more." R. 137 at 41. The x-ray thus calls Phillips' credibility into doubt.

But, Phillips insists, there is a more favorable way to use the x-ray. It allowed him to undermine the State's insinuation that he shot Glodo "execution style" directly from behind him. *Id.* at 18; *see Carusone v. Warden, N. Cent. Corr. Inst.*, 966 F.3d 474, 479 (6th Cir. 2020). According to Dehus, the x-ray suggests that the birdshot entered at an angle. If true, that means Phillips pulled the trigger while standing off Glodo's centerline.

But is this characterization true? Dehus concedes he has little experience reading x-rays because he isn't a doctor. That inexperience became apparent during the evidentiary hearing when he repeatedly misinterpreted the skull's orientation within the image. Dr. Schott, by contrast, has plenty of practice handling x-rays and a medical degree to boot. She testified that the lack of an additional image showing Glodo's skull from the side made it impossible to deduce anything about the angle of Phillips' shot. After listening to both experts, the district court found Dehus' testimony unreliable. *See Phillips v. Valentine*, No. 6:13-22, 2018 WL 4976801, at *2 (E.D. Ky. Oct. 15,

2018). We may disturb that finding of fact only if it sinks to clear error. *See Bennett v. Brewer*, 940 F.3d 279, 286 (6th Cir. 2019).

Even granting Phillips the benefit of the doubt about what the x-ray establishes, his argument does little. The State never argued, not once, that Phillips shot Glodo execution style. During opening and closing remarks the prosecutor promised only to show that Phillips "took a 12-gauge shotgun and intentionally pulled the trigger and shot [] Glodo in the back of the head." ROA at 77, 367. The jury could convict Phillips of intentional murder, he argued, if it found that he "intentionally act[ed]" (by pointing his gun at Glodo and pulling the trigger) with "[a] result in mind" (killing Glodo). *Id.* at 373. Nothing in the statements depends on the angle of Phillips' shot.

Dr. Schott, true, testified that the birdshot travelled from "back to front" in Glodo's head. *Id.* at 190. And the prosecutor, true also, discounted in closing argument that the birdshot merely "grazed" Glodo by noting that it went "directly from [Glodo's] back into his head." *Id.* at 373. But the x-ray supports both statements. As for Dr. Schott's statement, the birdshot did move from the back of Glodo's head toward the front. That it also moved laterally somewhat (that is, from the center of Glodo's head to one side) is neither here nor there. As for the prosecutor's statement, the birdshot did go "into [Glodo's] head," and the pellets did enter his head "directly from his back." *Id.* Dehus said as much: "[L]et's be clear, the victim was shot in the back of the head." R. 137 at 13. The prosecutor's comments describe only the shot's placement on the skull, not the angle of entry. The x-ray does nothing to change that. So it could not have undermined, let alone "plainly discredited," the "actual theory upon which the prosecution obtained a conviction." *Carusone*, 966 F.3d at 479.

31

All of this, it should be remembered, was put in the clearest context for the jury and would have been put in the same clear context with the x-ray: the autopsy photos of Glodo. Those photos dispel any doubt that Glodo sustained a direct shotgun blast to the back of his head. Look at Appendix A to see one of them for yourself.

In the face of this photo and others like it submitted to the jury, ankle-biting disputes about the precise direction of the shotgun blast—from back to front directly or from back to front at an angle—represent the epitome of non-material information. That is all the more true in view of what the jury did. It acquitted Phillips of intentional murder as is, making non-evidence-based talk about an execution-style murder irrelevant to that count. *See Kyles*, 514 U.S. at 443 n.14. And the precise angle of Phillips' shot could not have dissuaded a reasonable juror from convicting him of wanton murder. The jury had instructions to convict Phillips of that offense if it found that he engaged in conduct that "created a grave risk of danger to another" in a manner "manifesting [] extreme indifference to human life." ROA at 344; *see also* Ky. Rev. Stat. § 507.020. Discharging a shotgun in the general direction of a person, even without aiming the shotgun, clears that bar by a large and comfortable margin. *See, e.g.*, *Crane v. Kentucky*, 833 S.W.2d 813, 817 (Ky. 1992); *Kruse v. Kentucky*, 704 S.W.2d 192, 193 (Ky. 1985).

Nor could the x-ray have swayed any reasonable juror to favor convicting Phillips of manslaughter or reckless homicide. Those offenses differ from wanton murder in that they concern circumstances where the defendant had the privilege to act in self-defense and misapprehended the need to use force or mistook the degree of force required. *See* Ky. Rev. Stat. §§ 507.030, 507.050. Evidence that Phillips' shot came in at an angle—but still from the back of the head—does not bear on any apprehension of risk.

32

The court suggests another possible benefit of Phillips having the x-ray. It could incline the judge or jury towards lenity during sentencing. But the court offers no explanation why the x-ray could have won Phillips sympathy. This was a murder trial, not a marksmanship contest. That Phillips did not hit Glodo squarely might say something about his aim, but it says nothing about the culpability of discharging a weapon at, or even near, a person when they are turned away. If anything, the x-ray's tendency to undermine his self-defense theory increased the risk of receiving a harsher sentence. While Phillips' 30-year sentence exceeds the 20-year statutory minimum for wanton murder, it does not approach the statutory maximum of life in prison.

I respectfully dissent.

**Appendix A to dissent of Sutton, J.**

